WYNFIELD INNS, a Florida General Partnership, Plaintiff–Counterclaim Defendant–Appellant,

v.

The EDWARD LEROUX GROUP, INC., a corporation, Defendant–Counterclaim Plaintiff–Appellee,

Edward "Buddy" Leroux, Michael Bradley, et al., Defendants.

No. 88–3147.

United States Court of Appeals, Eleventh Circuit.

March 13, 1990.

Gerald Tockman, Tockman & Wolk, St. Louis, Mo., Patricia M. Gibson, Maher, Overchuck and Langa, Orlando, Fla., for plaintiff-counterclaim defendant-appellant.

James DeGiacomo, Judith K. Wyman, Roche, Carens & DeGiacomo, Boston, Mass., for defendant-counterclaim plaintiff-appellee.

Before KRAVITCH and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

CLARK, Circuit Judge:

This appeal involves a hotel franchise dispute between a Florida general partnership and a Massachusetts corporation. The plaintiff, Wynfield Inns partnership ("Wynfield"), appeals the district court's grant of a directed verdict in favor of the defendant, The Edward LeRoux Group, Inc. ("LeRoux Group"), on plaintiff's contract, fraud, RICO and punitive damages claims. We affirm.

## I. Background

### A. The Wynfield Inns Concept

Wynfield Inns hotels are limited service, "rooms only" hotels that offer no "expensive frills or unneeded amenities" such as food and beverage services. Associated Inns & Restaurants Company of America, (AIRCOA), a Colorado corporation which operates about 150 hotels nationwide, developed the Wynfield Inns concept in 1983.

In order to franchise the Wynfield Inns concept, AIRCOA created a wholly-owned subsidiary, AIRCOA Equity, Inc., which joined with Fairfield Inns (Fairfield), a Florida corporation, to form the plaintiff Wynfield Inns, a Florida general partnership. AIRCOA Equity and Fairfield entered their general partnership agreement on July 26, 1983. Each corporate partner held a 50% interest and made a $50,000 capital contribution to the partnership. The partnership's stated purpose was to develop, finance, sell, lease, franchise and manage the limited service hotels. David Theophilus, an executive vice president of AIRCOA, was appointed to manage the Wynfield partnership. Kurt Thelan, an AIRCOA employee, became Wynfield's director of operations.

Fairfield's principal shareholders were John F. Lowndes, an Orlando, Florida attorney, and James E. Russell, an Orlando real estate developer. Russell has extensive expertise in hotel development.

## B. The Franchise Contract

Wynfield entered the disputed franchise contract with defendant LeRoux Group, a Massachusetts corporation. Edward "Buddy" LeRoux, LeRoux Group's chairman, held a 95% ownership stake in the corporation. LeRoux Group's extensive operations include a real estate development division. The real estate development division forms real estate partnerships to build and operate various office complexes, condominiums and apartments. Orchestrated Management, which LeRoux Group purchased in 1984, was responsible for managing the real estate division's assets and Raymond J. Dunn, III, was Orchestrated Management's president and chief executive officer.

In the summer of 1984, Michael J. Bradley, the president of LeRoux Group's real estate development division, expressed interest in the Wynfield Inns project. In his previous position with Aetna Life Insurance Company, Bradley had become acquainted with Mr. Russell and Mr. Lowndes in connection with a $20,000,000 loan by Aetna to Fairfield. Bradley knew of Mr. Russell's extensive experience in hotel development and the two men shared a mutual respect. Theophilus, Wynfield's manager, sent Bradley materials explaining and promoting the Wynfield Inns concept. After reviewing the materials sent to him by Theophilus, Bradley conferred with Buddy LeRoux. Later, Russell met with Mr. LeRoux, Bradley and Dunn in Boston to discuss the possibility of the LeRoux Group joining the project. Mr. LeRoux, Bradley, Dunn, and Mr. LeRoux's attorney later met with Russell, Lowndes and Theophilus in Orlando for further discussions. Soon thereafter Bradley was sent drafts of a Territorial Rights Agreement.

In the Territorial Rights Agreement the Wynfield partnership granted LeRoux Group the exclusive right to build, own and operate "Wynfield Inns" hotels in two geographic areas, which included the New England states, New Jersey and Westchester County, New York. LeRoux Group was to build five hotels in each of the two areas over the next few years. The Agreement contained a non-assignability provision which stated:

> Neither party shall have the right to assign this agreement without the prior written consent of the other, which consent may be arbitrarily withheld. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their respective heirs, legal representatives and permitted successors and assigns.

Territorial Rights Agreement, Art. X. Mr. LeRoux signed the Agreement on behalf of LeRoux Group on December 31, 1984. Bradley returned the signed Agreement to Lowndes, informing him that LeRoux Group had not executed the license and management agreements because it had some reservations about the terms of those agreements. In that correspondence, Bradley disclosed some, but not all, of his reservations about the terms. Bradley and Theophilus engaged in ongoing negotiations regarding these agreements for about eight or nine months, but the license and management agreements were never executed.

After the Territorial Rights Agreement was signed, Bradley located possible hotel sights in Portland, Maine and New Jersey. On April 8, 1985, he entered into contracts for the design and supervision of the construction of the hotels with Alan Berman, an Orlando architect.

## C. Fairfield Checks Out

The Wynfield partnership agreement between Fairfield and AIRCOA Equity permitted the transfer of an interest in the partnership with the prior written consent of "controlling partners."[1] The partnership agreement specified that only certain events constituted a dissolution of the partnership. Partnership Agreement, Arts. I, XIV. Transfer of a partnership interest was not an event which would result in the partnership's dissolution.

---

1. "Controlling partners" means partners who hold in the aggregate not less than a 90 percent interest in partnership profits and losses. Partnership Agreement, at 2.

On June 1, 1985, Fairfield assigned its entire partnership interest in Wynfield to *Wynfield Inns, Inc.*, a newly created, wholly-owned AIRCOA subsidiary. Assignment Agreement, Defendant's Exh. 8. AIRCOA, therefore, became the sole owner of the Wynfield general partnership through its ownership and control of both AIRCOA Equity and Wynfield Inns, Inc.

On August 8–9, 1985, Bradley went to Orlando to meet with Berman and Theophilus to discuss the Wynfield venture. Upon Bradley's arrival, Theophilus directed him to Lowndes's office where Lowndes explained that Fairfield had transferred its interest in the Wynfield partnership and that he and Russell were thus no longer involved in the Wynfield deal. Bradley explained that this turn of events would pose a major problem because Mr. LeRoux and Mr. Dunn would be very upset by the fact that Russell would no longer be involved and that they had not been notified of this transfer of partnership interest when it occurred several weeks earlier.

### D. LeRoux Group Checks Out—Wynfield Left Holding the Bag

Mr. Bradley subsequently explained the situation to Mr. LeRoux and Mr. Dunn. Both men expressed extreme displeasure at this news and Dunn instructed Bradley to confirm it with Russell. Bradley arranged for the Chairman of AIRCOA, Willis McFarlane, to attend a Boston Red Sox game in Mr. LeRoux's private viewing room at Fenway Park. During the game Mr. LeRoux spoke with Mr. McFarlane only briefly, and afterward Mr. LeRoux persisted in his decision to terminate the relationship with the Wynfield partnership. Soon thereafter, Mr. LeRoux ordered Dunn and Bradley to investigate other alternatives to the Wynfield franchise, including other management companies. Bradley complied by contacting Hampton Inns, a subsidiary of Holiday Inns, Inc., and Boykin Management Company, a Wynfield competitor, in early September and October to discuss the possibility of entering into a management contract for LeRoux Group's two hotels. However, he also continued to conduct business with the Wynfield partnership. He met with Theophilus and McFarlane to inspect the Maine hotel site on August 21, 1985, the day after McFarlane's brief meeting with Mr. LeRoux at the Red Sox game, and continued to negotiate the terms of the management and license agreements. Thelan, Wynfield's operations director, continued to send LeRoux Group a number of memoranda containing valuable "how to" information for operating a Wynfield Inn.[2]

On about September 16, 1985, however, Bradley telephoned Theophilus and told him that LeRoux Group was out of the deal and that it was going to operate the two hotels independent of Wynfield under different names and management. LeRoux Group ultimately opened the two hotels (one each in Maine and New Jersey) and operated them under different names and through different limited partnerships (Philbrook Hotel Associates and Whittier ACY Associates).

### E. Wynfield Calls Upon the District Court

Wynfield Inns filed an amended multicount complaint against Mr. LeRoux, Bradley, LeRoux Group, Orchestrated Management, Whittier ACY Associates, and Philbrook Hotel Associates. Count I alleged that LeRoux Group breached the franchise contract by opening non-Wynfield hotels within the restricted territorial areas. Count II alleged that the defendants received benefits such as assistance in locating, building, and operating the hotels, under an implied contract for which quantum meruit damages were recoverable. The final six counts were various fraud, trade secret, and RICO claims asserting that the various defendants intentionally defrauded Wynfield Inns because they never had any intention of honoring the franchise contract

---

**2.** During August of 1985 Wynfield furnished the LeRoux Group lists of equipment and supplies that would be needed to open the Maine hotel, a master purchase list, and information on budget, training and staffing requirements and preopening arrangements.

but instead were only interested in receiving the "know-how" of the hotel business.

LeRoux Group filed a counter-claim alleging that the Wynfield partnership breached the franchise contract. In a ruling from the bench at the close of evidence on January 28, 1988, the district court directed a verdict for the defendants on plaintiff's first count, the contract claim, as well as counts three through eight. On the contract claim, the court ruled that Fairfield's transfer of its partnership interest in the Wynfield partnership constituted a prohibited assignment barring Wynfield's recovery under a contract theory. On the defendant's counterclaim for breach of contract, the court directed the jury to find that Fairfield's assignment of its partnership interest in Wynfield Inns amounted to a breach of the Territorial Rights Agreement by the Wynfield partnership. The court also directed a verdict for the defendants on the trade secret count, finding an absence of proof that the defendants misappropriated any protectible trade secrets. Under the fraud count, the court held that Wynfield failed to provide any evidence that the defendants intended to defraud Wynfield at the time they entered the Territorial Rights Agreement in December 1984; further, the court held that the defendants did not fraudulently induce or perform the Agreement. Wynfield voluntarily dismissed the state law deceptive trade practices count. Finally, · the court dismissed the two RICO counts, implicitly finding that the defendants had not violated the mail fraud statute.[3] The jury returned a $323,667 verdict for Wynfield[4] under count two (quantum meruit) and nothing for LeRoux Group on its contract counter-claim. In the present case, Wynfield appeals the directed verdicts on its contract, fraud and RICO claims. LeRoux Group did not appeal the jury's finding that it suffered no damages as a result of Wynfield's breach of the Territorial Rights Agreement.

Subsequent to filing the appeal, Wynfield registered and accepted payment of the quantum meruit judgment in the District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1963. In its June 24, 1988 motion to register the Florida judgment with the Massachusetts district court, Wynfield specifically stated that it had filed a notice of appeal from the Florida district court's order directing verdicts on the other counts and included a .copy of the notice of appeal. The Massachusetts district court granted the motion on July 11, 1988 because it found the Florida district court judgment to be final. On September 8, 1988, LeRoux Group fully paid the quantum meruit judgment. First Execution, United States District Court for the District of Massachusetts, filed September 16, 1988.

## II. Discussion

### A. Bar of Contract Claim

LeRoux Group argues that Wynfield's appeal of the directed verdict on the contract claim is barred because Wynfield has registered and accepted payment of the quantum meruit judgment. LeRoux Group reasons that Wynfield's acceptance of the quantum meruit judgment constitutes an election of remedies precluding Wynfield from pursuing a contract remedy on appeal. Wynfield argues that the contract claim is separate and distinct from its quantum meruit claim and that satisfaction of the quantum meruit judgment does not bar an appeal of the contract claim.

Two related doctrines are applicable in this case: the doctrine of election of remedies and the "acceptance of benefits" rule. The former determines when a litigant, who has chosen between two or more inconsistent and coextensive modes of relief, is precluded from resorting to the others. The latter determines whether a litigant who accepts the benefits of a judgment is foreclosed from pursuing an appeal. We

---

**3.** The court noted that even if the defendants transmitted false statements through the mail, Wynfield had failed to make a prima facie showing that the defendant had the requisite criminal intent.

**4.** Prior to submission of the case to the jury, Wynfield waived the quantum meruit claim against all defendants except LeRoux Group.

hold that both doctrines preclude Wynfield's appeal of its contract claim.

### 1. Election of Remedies

■ The doctrine of election of remedies is "an application of the doctrine of estoppel and operates on the theory that a party electing one course of action should not later be allowed to avail himself of an incompatible course." *Barbe v. Villeneuve*, 505 So.2d 1331, 1332 (Fla.1987); *see Williams v. Robineau*, 124 Fla. 422, 168 So. 644, 646 (Fla.1936).

When a party elects between two or more inconsistent courses and has knowledge of all the pertinent facts, he binds himself to the course he adopts first and cannot later withdraw from this knowing election.

*Barbe*, 505 So.2d at 1334. The purpose of the doctrine is to prevent duplicative recovery for the same wrong by requiring a party to elect between legally coexistent and inconsistent remedies. *Id.* at 1332–33; *In re Alchar Hardware Co., Inc.*, 764 F.2d 1530, 1534 (11th Cir.1985). Inconsistent claims are claims that "proceed from opposite and irreconcilable claims of right and [are] so inconsistent that a party could not logically follow one without renouncing the other." *Barbe*, 505 So.2d at 1333.

■ Generally, an election between inconsistent remedies is made after a verdict is entered but prior to the entry of judgment. *Barbe*, 505 So.2d at 1333. Wynfield, however, did not have an opportunity to elect its remedy before judgment because the district court directed a verdict on its contract claim. Thus, Wynfield was unable to elect a remedy at the phase of litigation when such elections are typically made. *See, e.g., Wolfe v. Aetna Ins. Co.*, 436 So.2d 997, 1001 (Fla.Dist.Ct.App.1983) (directed verdict on one count dispenses with the opportunity to make an election between inconsistent remedies). Wynfield, however, chose to pursue and collect the quantum meruit judgment after instituting this appeal. The legal issue, therefore, is whether Wynfield's post-judgment actions constitute an election of remedies barring its contract appeal.

LeRoux Group argues that Wynfield's collection of the quantum meruit judgment bars its appeal of the contract claim because Wynfield cannot collect a judgment on both a quantum meruit theory (restitution) and a contract theory (reliance). They assert that because Wynfield has elected, post-judgment, to receive the quantum meruit measure of recovery, it has waived its right to pursue an appeal of its contract claim. Wynfield counters that it may pursue a contract remedy on appeal because the contract remedy is not duplicative of a recovery under its quantum meruit theory.

■ LeRoux Group's position is persuasive. Under Florida law, recovery of damages under both a quantum meruit and a contract theory is inconsistent, such remedies being mutually exclusive and alternative measures of recovery. *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So.2d 853, 858 (Fla.Dist.Ct.App.1972) (protection of the "reliance interest" and "restitutionary interest" are mutually exclusive). In this action, Wynfield voluntarily and knowingly chose to fully collect the quantum meruit measure of damages from LeRoux Group. This measure of recovery included Wynfield's loss of "the reasonable value of its expenses, plans, processes, know-how, efforts, services and labors." Wynfield's claim is not that it has been denied full compensation under its quantum meruit claim. Instead, its contract appeal is based on Wynfield's expectation that a contract theory might have produced a larger damage award. The measure of recovery Wynfield sought under a contract theory included the loss of "fees, charges and profits" that Wynfield "would have earned by developing, licensing, managing, and operating" the two hotels as well as other hotels it might have developed in LeRoux's exclusive territory. In addition, under its contract claim Wynfield sought the recovery of the "value of the confidential plans, processes and know-how" supplied to LeRoux Group. Wynfield therefore essentially seeks to litigate a claim whose premise, the existence of a contract, is inconsistent with the quantum meruit judgment it has accepted and whose measure of recovery in-

cludes duplicate elements of damages. We hold that because Wynfield's post-judgment acceptance of the quantum meruit remedy is inconsistent with further pursuit of its contract claim, Wynfield is estopped from pursuing a contract remedy on appeal. *Barbe*, 505 So.2d at 1333. ("If the allegation of facts necessary to support one remedy are substantially inconsistent with those necessary to support the other, then the adoption of one remedy waives the right to the other.")

Wynfield asserts that following a new trial on its contract claim, the district court would simply have to setoff Wynfield's recovery on the contract claim (if any) against the existing quantum meruit judgment. We view Wynfield's suggested procedure in a different light. Rather than a simple setoff, this procedure would require Wynfield to relinquish its quantum meruit judgment in order to elect recovery under the inconsistent contract remedy. This procedure is precisely the type of post-judgment election of remedies Wynfield cannot employ. In accepting payment of the quantum meruit judgment, Wynfield has elected its remedy. We conclude that Wynfield's decision to collect payment from LeRoux Group on the quantum meruit judgment prevents it from pursuing an inconsistent contract remedy on appeal.

### 2. Acceptance of Benefits Doctrine

■ Wynfield's appeal on the contract claim is also barred under the "acceptance of benefits" doctrine, which provides that a party who voluntarily and knowingly accepts the benefits of a judgment or decree cannot seek a reversal of the judgment or decree on appeal. *McMullen v. Fort Pierce Financing Constr. Co.*, 108 Fla. 492, 146 So. 567, 568 (Fla.1933). This doctrine is based on the theory that a party who voluntarily collects a judgment is estopped from seeking reversal of the judgment because acceptance of payment acts as a release of claimed errors of the trial court. *Id.* The doctrine precludes an appeal unless (1) the judgment appealed from consists of two or more separate, distinct and unrelated parts; or (2) there is no controversy regarding the amount of a judgment to which a litigant is entitled in any event. *Id.* 146 So. at 568–69.

■ Because Wynfield accepted and collected the quantum meruit judgment, the acceptance of benefits doctrine precludes Wynfield's contract appeal unless one of the two exceptions apply. The first exception is inapplicable for the same reasons Wynfield's election of remedies argument fails: quantum meruit and contract remedies are inconsistent, mutually exclusive, and alternative measures of recovery. *Beefy Trail*, 267 So.2d at 858. In this case, because the two remedies arise from the same wrong, Wynfield's contract claim is not separate, distinct and unrelated to its quantum meruit claim.

The second exception is also inapplicable because Wynfield's entitlement to the amount of the quantum meruit judgment was not uncontested. *McMullen*, 146 So. at 568. As in *McMullen*, the parties contested the amount of damages throughout the litigation. *Id.* 146 So. at 569. LeRoux Group has never admitted that it owed Wynfield any amount of the quantum meruit judgment—instead the parties have intensely contested liability. Admittedly, because LeRoux Group did not file a cross-appeal on the quantum meruit judgment, Wynfield's entitlement to this judgment could be characterized on appeal as "uncontested." It would be unfair, however, to permit Wynfield to collect the quantum meruit judgment, and then allow Wynfield to meet the second exception by claiming that LeRoux Group did not contest the judgment. Instead, a more principled approach recognizes that Wynfield's pursuit and acceptance of LeRoux Group's payment of the quantum meruit damages bars Wynfield's appeal on the contract claim.

Further, this action is unlike situations where a party whose entitlement to a particular amount of recovery is uncontested seeks additional recovery under a single legal theory.[5] The issue here is not wheth-

---

5. *See, e.g., Kuharske v. Lake County Citrus Sales, Inc.*, 44 So.2d 641 (Fla.1949); *Brown v. Epstein*, 208 So.2d 836 (Fla.Dist.Ct.App.1968). *See also McMullen*, 146 So. at 569 (providing example).

er LeRoux Group owes Wynfield some additional amount of quantum meruit damages beyond those allegedly uncontested; instead, the issue Wynfield advanced on appeal is whether LeRoux Group owes Wynfield greater damages under a different legal theory (i.e. a contract theory). Thus, Wynfield's appeal does not fall within the second exception and its acceptance of the benefits of the quantum meruit judgment bars its appeal on the contract claim.

### 3. Summary

In summary, Wynfield's collection of the quantum meruit judgment forecloses its appeal of the directed verdict on its contract claim for two reasons. First, Wynfield's decision to collect the quantum meruit judgment from LeRoux Group constitutes a post-judgment election of remedies which precludes its appeal on an inconsistent contract theory. Second, under the acceptance of benefits doctrine, Wynfield's acceptance of the benefits of the quantum meruit judgment prevents Wynfield from now appealing under a contract theory. Because Wynfield's appeal on its contract claim is barred, we need not address Wynfield's contentions that the district court erred in directing a verdict for LeRoux Group on the contract claim or erred in overruling Wynfield's pre-trial motions *in limine* to exclude certain evidence relating to the terms of the contract or post-execution negotiations.[6]

■■■ A further limitation is the "consent to judgment rule" which provides that a party who accepts a judgment *in toto* without a reservation of rights to appeal may not later pursue an appeal. *Fidelcor Mortg. v. Insurance Co. of North America*, 820 F.2d 367, 369–70 (11th Cir.1987). This rule does not apply in this action because Wynfield specifically reserved its right to appeal in its motion to register the quantum meruit portion of the judgment. Wynfield did not consent to judgment in the entire action—it accepted only the

quantum meruit judgment and reserved its right to appeal. The consent to judgment rule therefore does not prevent Wynfield's appeal of claims which are separate and divisible from the quantum meruit claim. Thus, Wynfield's appeal of the district court's directed verdicts against Wynfield on the fraud, punitive damages, and RICO claims is proper under the first exception because these claims are independent of and divisible from Wynfield's quantum meruit claim. *Id.* at 369.

### B. Fraud, RICO, and Punitive Damages Claims

■■■ Wynfield claims that the district court erred in directing a verdict in the defendants' favor on its fraud, RICO and punitive damages claims. Wynfield's position is that the defendants intended to defraud Wynfield of proprietary information and other support services by promising to enter into a pre-opening furniture, fixture and equipment (FF & E) agreement, and the license and management agreements when in fact they had no intention of executing or performing these agreements. The defendants counter that Wynfield failed to introduce any evidence of intent to defraud, a necessary element of each of these claims.

Under Florida law, a common law fraud or misrepresentation claim requires:

(1) a false statement of fact, (2) known by the defendant to be false at the time it was made, and (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representations; and (5) resulting damages to the plaintiff.

*Stowell v. Ted S. Finkel Inv. Services, Inc.*, 641 F.2d 323, 325 (5th Cir. Unit B 1981). Florida law further recognizes that "a promise is actionable as fraud only when the promisor had a positive intent not to perform his promise, or made the promise without a present intent to perform it."

---

**6.** Because we do not reach the merits of Wynfield's appeal on the contract claim, nothing in this opinion is intended to express a view as to the propriety of the district court's holding that

the Territorial Rights Agreement was breached when Fairfield transferred its partnership interest to Wynfield Inns, Inc.

*Bissett v. Ply–Gem Industries, Inc.,* 533 F.2d 142, 145 (5th Cir.1976). The parties' central dispute is whether Wynfield provided sufficient evidence to establish that the defendants misrepresented their intentions to perform under the franchise agreements from December 1984 through the fall of 1985. Wynfield's theory under its RICO claim also requires Wynfield to make a *prima facie* showing of fraud. Wynfield claims the defendants violated RICO because they "engaged in a pattern of theft of hotel development and management services through violations of the mail and wire fraud statutes." Again, the defendants claim the district court properly directed a verdict because Wynfield failed to provide evidence of the element of fraudulent intent which the mail and wire fraud statutes require. Because the dispute over the grant of directed verdict on the fraud and RICO claims involves the same issue of whether Wynfield made a prima facie showing of fraudulent intent, we will analyze the appeal on the fraud and RICO claims together.

In reviewing a district court's grant of a motion for a directed verdict, this court must decide whether, "considering all of the evidence in the light most favorable to the opponent, the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not reach a different conclusion." *Aldridge v. Montgomery,* 753 F.2d 970, 972 (11th Cir.1985). Under this standard, the district court properly directed a verdict for the LeRoux Group under the fraud and RICO counts. Although Wynfield exhorts that there is substantial evidence of the LeRoux Group's intent not to perform, our review of the record indicates to the contrary.

We have carefully reviewed the testimony of the principal witnesses in this case and conclude that the district court was correct in directing a verdict in favor of the defendants. We gather from Wynfield's brief that there are two areas from which

Wynfield infers fraud.[7] The Territorial Rights Agreement executed by LeRoux Group and the Wynfield partnership anticipated that the parties would enter into licensing and management agreements prior to the opening of the hotels. The testimony reflects that the LeRoux Group did not execute the licensing and management agreements concurrent with the Territorial Rights Agreement because it wanted to negotiate some changes in them. Wynfield argues that the LeRoux Group withheld signing these agreements because it intended to obtain as much proprietary information and assistance from Wynfield as possible, but never intended to complete a permanent franchising agreement with Wynfield.

In deciding whether a reasonable person could have found, based on the evidence presented, that the LeRoux Group intended to defraud Wynfield, we must consider the appropriate burden of proof. The burden of proof is a substantive issue and is therefore controlled by state law in diversity cases. *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943); *United States for Use & Benefit of General Elec. Supply Co. v. Wiring Inc.,* 646 F.2d 1037 (5th Cir. Unit B 1981). Formerly, Florida law required plaintiffs to prove fraud by clear and convincing evidence. However, in *Wieczoreck v. H & H Builders,* 475 So.2d 227 (Fla.1985), the Florida Supreme Court clarified some conflicting decisions and held that only a preponderance of the evidence is required to establish fraud.

Nevertheless, the facts presented at trial belie Wynfield's contentions of fraud. Bradley testified that he knew the contract required Wynfield to manage the LeRoux Group hotels and he knew that LeRoux Group had to execute the licensing and management contracts. (R. 13 at 977, 985). Further, all of the LeRoux Group witnesses, including Mr. LeRoux himself, testified that what LeRoux Group was seeking from

---

7. Wynfield presents extensive legal arguments in its brief, but woefully neglects to point to facts established in the record which support those legal arguments. In fact, in support of its argument that it successfully presented a *prima facie* case of fraudulent intent, Wynfield cites only two record references.

the Wynfield partnership was expertise in hotel management. This is supported by testimony that LeRoux Group had previously lost the operation of a Hampton Inn in Orlando because of management failures.

It is further clear that the LeRoux Group terminated the contract with Wynfield because of the withdrawal of Russell and Lowndes from the Wynfield project. Mr. LeRoux testified that in the first meeting with Russell he was impressed with Russell's good management experience and success in the hotel field, that Russell's group appeared to have good development and construction abilities and that the two groups should have a good marriage. (R19–1722–24) While it is true that the record shows that Russell's expertise was in the investment aspects of hotel development rather than in the nitty-gritty of day-to-day management, there is no question that Russell had been very successful in hotel developments. Furthermore, it is uncontroverted that Mr. LeRoux *thought* that Russell was important to the LeRoux Group's success in the Wynfield Inn project, even though he may have been wrong.

We find, therefore, that the district court did not err in directing a verdict in favor of the defendants on Wynfield's first fraud theory. This theory is that because the LeRoux Group executed the Territorial Rights Agreement without executing the licensing and management contracts, the LeRoux Group never intended to execute the licensing and management agreements. Wynfield has offered no facts to support this theory and the trial testimony directly refutes this theory. From the evidence presented at trial, no reasonable jury could conclude that LeRoux Group never intended to complete a franchise relationship with the Wynfield partnership. Instead, the uncontroverted evidence shows that LeRoux Group executed the Territorial Rights Agreement intending to go through with the deal, and decided not to continue after Fairfield assigned its partnership interest to Wynfield Inns, Inc., thus removing Russell from the deal.

Wynfield next contends that LeRoux Group committed fraud by continuing to obtain proprietary information from Wynfield after having decided to terminate the contract. The contract was officially terminated by LeRoux Group on September 16, 1985 when Bradley called Theophilus, Wynfield's chief operating officer (R13–1027), although Mr. LeRoux individually made the decision not to go forward with Wynfield in mid-August when he learned from Bradley that Russell and Lowndes were no longer involved. (R19–1727–28). Mr. McFarlane, the chief executive officer of Wynfield, was invited by Bradley to attend the Red Sox baseball game on August 20 in Mr. LeRoux's private viewing room. Nevertheless, the testimony of Mr. LeRoux, Bradley, and McFarlane shows that Mr. LeRoux and Mr. McFarlane conversed not more than three minutes, that Mr. LeRoux expressed extreme displeasure at the withdrawal of Russell and Lowndes, and gave the impression that there would be no further dealings between the LeRoux Group and the Wynfield partnership.

In spite of Mr. LeRoux's adamant stance on this issue, Bradley, McFarlane, and Theophilus visited several tentative sites for Wynfield Inns the next day. Between August 20th and September 16th there were further discussions about the yet unsigned management contract. Mr. Theophilus testified that Wynfield provided valuable services and information to the LeRoux Group after August 20, including "documentation regarding the whole subject of preopening, furniture, fixtures and equipment, . . . specifications on various equipment, . . . information on the linen . . . and laundry equipment." (R6–155–56).

Nevertheless, the following facts remain uncontroverted in the record. LeRoux Group wanted to develop hotels in the northeastern United States. Mr. LeRoux was impressed by Mr. Russell's hotel development acumen and LeRoux Group picked Wynfield as a desirable franchisor because of Russell's expertise. LeRoux Group had some objections to the terms of the licensing and management agreements but continued to work toward mutual agreement with Wynfield on the terms to be included in those agreements. When Mr. Russell withdrew from the project, Mr. LeRoux became disenchanted. Bradley, the Le-

Roux official responsible for making the new hotels successful, realized that no person in LeRoux Group had the ability to manage hotels. Thus Bradley kept dealing with Wynfield for an additional three weeks after Mr. LeRoux said he wanted to terminate. When he realized that Mr. Le-Roux would not change his mind, he called Mr. Theophilus and informed him that Le-Roux Group would not continue with the franchise relationship.

Again, Wynfield's second fraud theory remains just that, a theory. We agree that the actions of Bradley and other LeRoux Group employees in continuing to deal with Wynfield after Mr. LeRoux had clearly stated his intention to withdraw caused Wynfield to continue imparting valuable information to LeRoux Group in anticipation of completing a deal that would never come about.[8] This scenario alone, however, is not sufficient to prove that LeRoux Group intended to defraud Wynfield. Wynfield has offered only theories and speculations as to why LeRoux Group entered into the Territorial Rights Agreement, but never completed the deal. The fact that the Territorial Rights Agreement was signed and that the deal was later broken off is insufficient to prove an intent to defraud by a preponderance of the evidence. Similarly, evidence that Bradley continued to go forward for one month after Mr. LeRoux had announced that the deal was off is insufficient to prove an intent to defraud. Wynfield has failed to present evidence in support of its theory that the reason these things happened is that LeRoux Group wanted to defraud Wynfield. We agree with the district court that reasonable jurors could not decide from the evidence presented at trial that the LeRoux Group had an intent to defraud Wynfield.

For the foregoing reasons, we agree that the district court was correct in directing a verdict on Wynfield's fraud and RICO claims. Furthermore, the lack of sufficient proof on these claims naturally precludes recovery of punitive damages. Finding that appellant waived his right to appeal the district court's ruling with respect to

the contract claim, and that no errors were committed with respect to any of appellant's other claims, the judgment of the district court is

AFFIRMED.

---

**8.** However, Wynfield has been compensated for all services it rendered to LeRoux Group by LeRoux Group's payment of the $323,667 quantum meruit judgment.