**Gordon JONES and Laura Jones, Plaintiffs–Appellees,**

v.

**John H. CHILDERS and Talent Services, Inc., Defendants–Appellants.**

No. 92–2744.

United States Court of Appeals, Eleventh Circuit.

April 7, 1994.

---

* Judges Joel F. Dubina and Ed Carnes have recused themselves and will not participate.

Senior Judge Paul H. Roney has elected to participate in further proceedings in this matter pursuant to 28 U.S.C. § 46(c).

John R. Kiefner, Jr., Riden, Earle & Kiefner, PA, Clifford J. Hunt, St. Petersburg, FL, for defendants-appellants.

Burton Webb Wiand, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Clearwater, FL, for plaintiffs-appellees.

Before BIRCH, Circuit Judge, CLARK, Senior Circuit Judge, and HOEVELER *, Senior District Judge.

HOEVELER, Senior District Judge:

Defendants John H. Childers and Talent Services, Inc. ("TSI") appeal the judgment of the United States District Court for the Middle District of Florida in a civil action brought by Plaintiffs Gordon and Laura Jones. The district court ruled that Defendants were negligent and committed fraud, breach of fiduciary duty, breach of contract, and Florida civil RICO violations in the course of their representation as the agent and financial advisor of Gordon Jones, a professional football player. Defendants contend that the district court misapplied Florida laws which should have barred most of Plaintiffs' claims and erred in awarding Gordon Jones treble his actual damages pursuant to Florida's civil RICO statute, Fla.Stat. § 772. For reasons explained fully below, we AFFIRM in part and REVERSE in part.

## I. BACKGROUND

a. *Case History*

On December 3, 1987, Plaintiffs filed this action in the Circuit Court for Hillsborough County, Florida, alleging that Defendants Childers and TSI committed fraud, negligence, breach of contract, and Florida civil RICO violations while representing Gordon Jones, a professional football player, as his agent and financial advisor. The case was removed, on the basis of diversity jurisdiction, to the United States District Court for the Middle District of Florida on January 25, 1988.

The district court, the Honorable Anne C. Conway presiding, held a non-jury trial of this matter from April 23, 1992, through May 1, 1992, at which time the trial was continued until May 7, 1992, when closing arguments were made. On June 26, 1992, the district court entered its Findings of Fact and Conclusions of Law, ruling that: (i) TSI and Childers are jointly and severally liable to Gordon Jones for $391,455; (ii) Childers is individually liable to Gordon Jones for $50,-000 for "mental anguish" caused by Childers' fraudulent conduct with respect to Gordon Jones; and (iii) TSI and Childers are jointly and severally liable to Laura Jones for $73,-337 in actual damages and $50,000 in punitive damages. It is from this judgment that Defendants appeal.

b. *Factual Background* [1]

TSI is an Illinois corporation which represents professional athletes in contract negotiations and provides business management services, including budgeting advice, tax planning, estate planning, insurance planning, and financial advice. Defendant Childers is the president of TSI and its sole shareholder. Among the agreements that TSI typically entered into with athletes was a Business Management Agreement. On October 28, 1981, Plaintiff Gordon Jones executed a Business Management Agreement with TSI; Childers, as TSI's president, executed the contract on behalf of the firm. At that time, Jones played professional football with the Tampa Bay Buccaneers. He and his fiancee, Laura, lived together and commin-

---

* Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. The following summary describes the general facts of this case. Where necessary, our analysis delves more deeply into those facts relevant to the several issues on appeal.

gled their funds from the fall of 1981 until their marriage in April 1982. Prior to their dealings with Childers and TSI, neither Gordon nor Laura Jones had experience with investments, nor did they have any experience in business. Although Laura Jones holds a Bachelor of Science degree in child development and child care, and Gordon Jones had attended college, neither Laura nor Gordon had taken any business related courses in college.

When Jones retained TSI, he was in debt and paying out more money in obligations than he was receiving from his salary as a football player. A TSI employee, Frank Schuette, recommended in a letter dated Dec. 1, 1981, that Jones purchase a $12,000 interest as a limited partner in an Israeli research project called Telron & Co. ("Telron I"), which would function as a tax shelter. On December 3, 1981, Jones entered into a subscription agreement in which he acknowledged receipt of a private placement memorandum which described the risks inherent in the limited partnership. He did not, however, read the document closely, and instead relied on what Laura Jones told him that Childers had told her about the tax shelters. The district court found that Childers told her the investments were low risk, the risk language was only there because the law required it, and that the IRS had approved the investment. These oral representations were contrary to the risk information disclosed in the private placement memo, which stated the probability of an IRS audit and the tax consequences which would result from an unfavorable result.

In October 1982, Childers sent Gordon Jones a letter informing him that he would likely be audited regarding Telron I. Laura Jones then called Childers and was told that she shouldn't worry because there were no problems and the audit was basically a formality.[2] In early December 1982, following the receipt of a private placement memorandum for a second tax investment shelter in another Telron venture ("Telron II"), Jones executed a subscription agreement and invested $10,000 in Telron II. The district court found that during the period preceding and following this second investment, Childers repeatedly told the Joneses not to be concerned about their investments and that the audit would turn out fine; further, the district court concluded that because the Joneses trusted and relied upon this advice, the couple took no independent action regarding their investments or legal rights.[3]

In June 1985, the Joneses received an IRS deficiency notice regarding the Telron I investment, which had by then gone sour and incurred losses. A second notice for the Telron II investment arrived a few months later. The Joneses' settled their tax dispute with the IRS for $90,000. As part of the settlement, they were permitted to claim the Telron investments as theft loss. On December 3, 1987, this action was filed by the Joneses to recover their damages.

On June 26, 1992, the district court issued a lengthy order stating, *inter alia*, the following factual findings and conclusions of law:

a. Childers was found to be an individual fiduciary to the Joneses, based upon his solicitation of their trust and promises to manage their commingled finances with appropriate caution and skill. TSI also was found to be a fiduciary to both Gordon and Laura Jones.

b. The district court concluded that the Joneses' causes of action did not accrue until June 1985, when they received the first IRS notice of deficiency. The district court found

**2.** Gordon Jones testified at trial that he did not have a "total understanding" of what an audit meant, and that he relied on Laura Jones to learn from Childers any facts relevant to their investment decisions.

**3.** At the time that Jones executed the Telron subscription agreements, Childers and TSI were not registered as "dealers" with the Florida Department of Bank and Finance ("Department"). *See* Fla.Stat. § 517.12(1). Nor were Defendants registered in Florida as "investment advisers."

*See* Fla.Stat. § 517.021(10)(a) and § 517.12(4). The district court found, properly in our view, that under Fla.Stat. §§ 517.302(1), violations of Chapter 517 constitute *per se* felonies for which there is no intent or scienter requirement. *See State v. Houghtaling,* 181 So.2d 636 (Fla.1965). We note also that violations of Chapter 517 may constitute predicate acts within the meaning of Florida's Civil Remedies for Criminal Practices Act ("CRCPA"), Chapter 772 of Florida's Statutes. *See* Fla.Stat. § 772.102(1)(a)(3).

that Plaintiffs' queries to Childers regarding their concerns about the tax shelters, coupled with his reassurances, constituted sufficient due diligence to avoid a finding that they had actual or constructive notice of their causes of action before the IRS notice arrived. The district court also found that the applicable statutes of limitations were equitably tolled until June 1985, because Childers fraudulently concealed from the Joneses' their right to bring suit against him and TSI.

c. Childers was found to have breached his fiduciary duty to both Gordon and Laura Jones; and their action for breach of fiduciary duty was found to have been filed within the four year statute of limitations governing such actions. Second, Gordon and Laura Jones were found entitled to recover damages for negligent provision of services from Childers individually and, with respect only to Laura Jones, from TSI. Third, the district court concluded that Plaintiffs had prevailed in their common law fraud claim against Childers, individually, and with respect only to Laura Jones, against TSI. The negligence and fraud claims also were found to have been timely filed.

d. TSI was found liable to Gordon Jones for breach of contract, as TSI's breach damaged Jones and his contract claim was timely filed within the five year statute of limitations.

e. Childers and TSI were found to have violated various provisions of Florida's securities laws, Fla.Stat. § 517, by working as unregistered dealers and through the commission of securities fraud in connection with the sale of the Telron securities to the Joneses.[4] With respect to securities fraud[5], Childers and TSI were found to have made the following material misrepresentations in connection with the sale of Telron I and II: (i) Childers' failed to disclose that he received sales commissions from the seller for the Joneses' purchase of the Telron securities; (ii) Childers failed to inform the Joneses of the certain tax liability which would eventually accrue on their investments through future "phantom" income; (iii) Childers misrepre-

sented both the magnitude of risk involved in Telron I and II and the nature of tax audits; and (iv) Childers failed to inform the Joneses that he had lost confidence in Telron I and II after Laura Jones expressed concern regarding the continued viability of the investments. The district court further found that the mere inclusion of risk disclosure information in the private placement memoranda did not relieve Childers and TSI of liability for their misrepresentations. In finding that the Joneses relied justifiably on Childers' representations, the district court emphasized the Plaintiffs' lack of sophistication in investment matters and the influence that Childers wielded as their fiduciary. Additionally, it was found that Childers recognized that the Joneses had no sophistication in financial matters and caused them to reasonably believe that he would manage their affairs competently and that Telron I and II were not risky investments. The purchase of Telron I and II was found to have proximately caused Gordon Jones' damages.

f. The sale of Telron I and II to Gordon Jones was found to constitute two separate transactions in securities with similar intents, results, and methods of commission, and the same victims. The sales were found to have continuity with one another because they occurred less than a year apart. The district court therefore concluded that the sales of Telron I and II constituted a pattern of criminal activity as defined in Fla.Stat. § 772.102(4) and § 772.103. These criminal acts were found to comprise the necessary predicate acts to create civil liability under § 772.104, which provides for treble damages for any person who proves by clear and convincing evidence that his injury was caused as a result of violations of § 772.103.

g. The Joneses were found not to have assumed the risk of loss in Telron I and II, and not to have been contributorily negligent.

Based upon these findings, damages were awarded in the sums described in the previous section.[6]

---

4. *See supra* note 3.

5. *See* Fla.Stat. § 517.301.

6. See Case History, *supra.*

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(a) provides that a district court's findings of fact in actions tried without a jury may not be reversed unless clearly erroneous.[7] Under the law of this Circuit, "[a] finding is clearly erroneous and reversible under Rule 52(a) only when 'the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.'" *Lincoln v. Bd. of Regents*, 697 F.2d 928, 939–940 (11th Cir.1983), *cert. den.*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983), quoting *Williamson v. Brown*, 646 F.2d 196, 200 (5th Cir.1981), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "If the district court's findings of fact are 'plausible in light of the record viewed in its entirety,' the court of appeals must accept them even if it is 'convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *United States v. Fidelity Capital Corp.*, 920 F.2d 827, 836 n. 36 (11th Cir.1991), quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

We review *de novo* the district court's conclusions of law. *Newell v. Prudential Ins. Co. of America*, 904 F.2d 644, 649 (11th Cir.1990).

## III. DISCUSSION

Childers and TSI raise the following issues on appeal:

(a) Defendants argue that the Joneses' tort claims for breach of fiduciary duty, negligence, and fraud against Childers should have been dismissed under Florida's economic loss doctrine.

(b) Defendants claim they were entitled to judgment because each claim advanced by Plaintiffs was barred by the applicable statute of limitations. Childers and TSI also argue that the district court erred in relying on the equitable tolling doctrine as an alternate basis for finding that the statutes of limitations had not expired.

(c) The district court is alleged to have committed an abuse of discretion in refusing to permit Defendants to add certain affirmative defenses not pled in the answer.

(d) Defendants contend that the plaintiffs should not have been awarded treble damages under Chapter 772 of Florida's Statutes.

We address each of these issues, before examining *sua sponte* the damage calculations made by the district court.

a. *Whether the economic loss doctrine bars the tort claims against Childers.*

■ The Eleventh Circuit has recognized that under Florida's economic loss doctrine, a plaintiff may not raise tort claims to recover solely economic damages arising from a breach of contract absent evidence of personal injury or property damage. *Interstate Securities Corp. v. Hayes Corp.*, 920 F.2d 769, 773 (11th Cir.1991), *reh'g, en banc, den.*, 929 F.2d 704 (1991). This rule proceeds from the theory that courts must preserve well-defined conceptual and practical distinctions between the body of law relating to contract damages and tort damages, so that contracting parties may rely confidently on their allocation of risk without fear that their counterparts will seek to recoup contract damages through tort actions. 920 F.2d at 777, n. 12. Accordingly, the economic loss doctrine provides that "parties to a contract can only seek tort damages if conduct occurs that establishes a 'tort "distinguishable from or independent of [the] breach of contract."'" 920 F.2d at 773, quoting *AFM Corp. v. Southern Bell Telephone & Telegraph Co.*, 515 So.2d 180, 181 (Fla.1987) (citing *Lewis v. Guthartz*, 428 So.2d 222, 224 (Fla.1982); accord *Florida Power & Light Co. v. Westinghouse Electric Corp.*, 510 So.2d 899 (Fla.1987).

■ Prior to the trial of this case, the district court dismissed all tort claims by Gordon Jones against TSI, ruling that because a contract, the Business Management Agreement, existed between Gordon Jones and TSI, the economic loss doctrine barred

---

**7.** Rule 52(a) states in pertinent part: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Gordon Jones' tort claims against TSI. In its trial order, the district court retained this ruling but permitted the Joneses to maintain their tort claims against Childers, finding that no contractual relationship existed between Childers, individually, and either of the Plaintiffs.

Childers contends that the district court should have found that the economic loss doctrine also foreclosed the Joneses' tort claims against him individually. It is argued that the district court's factual finding that the Joneses had for two and a half years retained Childers and relied fully on his business and investment advice is tantamount to a legal conclusion that an independent contractual relationship existed between Childers, individually, and the Joneses. *Appellant's Brief*, at 22. This argument is without merit, as Childers has failed to present any evidence that he and the Joneses entered into an express oral or written personal services contract independently of the Business Management Agreement.[8] Alternatively, Childers argues that an investment advisor's relationship, such as that which existed between him individually and the Joneses, gives rise to an *implied contract* requiring payment for services rendered. Such a "contract" is said to constitute a sufficient basis under the economic loss doctrine for foreclosure of the Joneses' tort claims.

We also reject this argument, as it, too, is belied by the evidence and based on an erroneous reading of Florida law. Under Florida law, "[c]ontracts implied in law are obligations imposed ... to prevent unjust enrichment" where a defendant has accepted a benefit "under circumstances that make it inequitable for him to retain it without pay-ing the value thereof." *Rite–Way Painting & Plastering, Inc. v. Tetor*, 582 So.2d 15, 17 (Fla.App. 2 Dist.1991). Unlike express contracts, which arise by mutual assent of the parties, implied or quasi contracts are "a fiction of the law, adopted to achieve justice and enforce legal duties by means of an action ex contractu where no true contract exists." 11 Fla.Jur.2d *Contracts*, § 236 (1979). Plainly this case has nothing to do with an action in quantum meruit, restitution, or anything related to the doctrine of implied contracts. We therefore find inapposite Childers' reliance on *Symon v. J. Rolfe Davis, Inc.*, 245 So.2d 278 (Fla.App. 4 Dist. 1971), *cert. denied*, 249 So.2d 36 (Fla.1971), an overruled implied contracts decision which fails even to address the economic loss doctrine, much less to support the proposition that an implied contract will bar a plaintiff's tort claims where no express contract governs relations between two parties. As presently constituted, Florida's economic loss doctrine does not bar the Joneses' tort claims against Childers.

b. *Whether the Joneses' claims are barred by the applicable statutes of limitations.*

TSI and Childers contend that the district court erred in ruling that the statutes of limitations did not expire on all of the Joneses' claims prior to the filing of their action on December 3, 1987. Defendants maintain that all of Plaintiffs' causes of action became viable by December 1, 1982, when the Joneses purchased the Telron II securities and acquired constructive notice, through the offering prospectus and other public documents available to them, that their legal rights had been invaded.[9] The applicable statutes of

---

**8.** Under the Business Management Agreement, Jones paid five percent of his income from professional football to TSI in return for the provision of investment and financial planning advice.

 We are somewhat puzzled that Childers, in the midst of arguing that he made a separate contract with the Joneses, hedges his position in a footnote stating that he does not "concede" that such a contract existed but will, for purposes of this appeal only, "not challenge the [district] court's finding in such regard." *Appellant's Brief*, at 21, n. 3. The appellant cannot have his cake and eat it too. He cannot assume one position for purposes of arguing this appeal while simultaneously reserving the right to reverse direction at a future time.

**9.** Plaintiffs purchased the Telron I securities on December 3, 1981, and the Telron II securities between December 1 and December 10, 1982. Defendants claim that the purchase was consummated on December 1, 1982, or at least prior to December 3, 1982; that is, more than five years prior to the filing of Plaintiffs' action. Plaintiffs, however, maintain that the sale was not consummated until after December 10, 1982, the approximate date when the Joneses' subscription was forwarded to Israel for final acceptance by the general partner. See, e.g., *Barnebey v. E.F.*

limitations for all of the claims at issue in this case run for either four or five years.[10] Defendants therefore argue that the district court should have dismissed as time-barred Plaintiffs' claims for breach of contract, breach of fiduciary duty, negligence, fraud, and violations of CRCPA.

### i. *The discovery rule.*

In *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), the Supreme Court held that in an action by an employee to recover for an illness contracted through the inhalation of silica dust, the three-year statute of limitations governing the employee's cause of action did not accrue until he became ill and was alerted by a physician's diagnosis that he had contracted silicosis. The Supreme Court rejected the defendant employer's contention that because the plaintiff was continuously exposed to silica dust from 1910 until his incapacitation in 1940, the cause must have accrued longer than three years prior to the filing of the action on November 25, 1941:

> If Urie were held barred from prosecuting this action because he must be said, as a matter of law, to have contracted silicosis prior to November 25, 1938, it would be clear that the federal legislation afforded Urie only a delusive remedy. It would mean that at some past moment in time, unknown and inherently unknowable even

in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability....

> We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights.

337 U.S. at 169–170, 69 S.Ct. at 1024–25.

■ Florida courts, relying on the reasoning in *Urie,* have broadly adopted the discovery principle, holding in a variety of legal contexts that the statute of limitations begins to run when a person has been put on notice of his right to a cause of action.[11] Generally under Florida law, a party is held to have been put on notice when he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action. For example, in an action for fraud such as the instant case,

*Hutton & Co., Inc.,* 715 F.Supp. 1512, 1526 (M.D.Fla.1989). Because we are in agreement with the district court that the Joneses' causes did not accrue upon their purchase of Telron II, it is unnecessary to determine the precise date in December 1982, when the purchase of Telron II was finalized.

10. The applicable statutes of limitations are as follows:

 1. *breach of contract:* five years. *See* Fla. Stat. § 95.11(2)(b).
 2. *breach of fiduciary duty:* four years. *See* Fla.Stat. § 95.11(3)(p).
 3. *negligence:* four years. *See* Fla.Stat. § 95.-11(3)(a).
 4. *fraud:* four years. *See* Fla.Stat. § 95.-11(3)(j).
 5. *CRCPA:* five years. *See* Fla.Stat. § 772.17.

11. See, e.g., *Miami v. Brooks,* 70 So.2d 306, 309 (Fla.1954) (holding in a negligence action that "the statute [of limitations] attaches when there

has been notice of an invasion of the legal right of the plaintiff or he has been put on notice of his right to a cause of action"); *Drake v. Island Community Church, Inc.,* 462 So.2d 1142 (Fla. App. 3 Dist.1984) (holding that in breach of contract action brought by mother and minor child against private school, statute of limitations did not begin on mother's claim until she learned of her child's sexual abuse by a teacher and was thereby put on notice of her right of action, and that statute did not begin to run against minor child until the mother knew or reasonably should have known of facts which supported the child's cause of action); *Creviston v. General Motors Corporation,* 225 So.2d 331 (Fla.1969) (relying on *Urie* in holding that the three year statute of limitations for implied warranty actions began to run when plaintiff first discovered, or reasonably should have discovered, defect in product, not from the date of sale of refrigerator); and *Tullo v. Horner,* 296 So.2d 502 (Fla.App. 3 Dist.1974) (holding that in cases of fraud, the statute of limitations ordinarily begins to run with the discovery of the fraud).

a party is charged with knowledge of facts which would have been discovered in the exercise of due diligence for purposes of determining when a cause of action ... accrues.... [H]owever, while the law of fraud does not endorse a 'hear no evil, see no evil approach,' neither does it require that an aggrieved party have proceeded from the outset as though he were dealing with thieves.

*First Federal Savings & Loan Ass'n. v. Dade Federal Savings & Loan Ass'n.*, 403 So.2d 1097, 1100 (Fla.App. 5 Dist.1981). "Whether an individual, by the exercise of reasonable diligence, should have known he had a cause of action against the defendant is, ordinarily, an issue of fact which should be left to the [trier of fact]." *Puchner v. Bache Halsey Stuart, Inc.*, 553 So.2d 216, 217 (Fla. 3d DCA 1989); accord *Green v. Bartel*, 365 So.2d 785, 788 (Fla. 3d DCA 1978) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action ... was a question of fact ... and it has been held that genuine issues relating to such question of fact are to be determined by the trier of facts ..."). We note, however, that a fraud victim bears a "less demanding" due diligence burden "where the perpetrator is rendering an expert service while standing in a fiduciary capacity." *Puchner*, 553 So.2d at 217.

ii. *The district court's findings of fact and application of the discovery rule.*

In the non-jury trial of this case, the district court found that Childers had created a fiduciary relationship with the Joneses by intentionally soliciting their trust and confidence and "represent[ing] to them that he could advise them with respect to their joint financial future and that he could manage their current financial affairs, including their commingled funds." *Order of June 26, 1992*, at 12. The trial judge found that Childers took advantage of his clients' ignorance in financial and tax matters and convinced them to invest in Telron I and II even though he knew that "the Israeli investments were wholly unsuitable for persons in the financial position of the Jones[es]." *Id. at 8.* The judge accepted as truthful the testimony of both of the Joneses that at that time in their lives they did not understand the concept of a tax shelter and "were led to believe that the 'tax shelter' presented to them by Childers and TSI was a safe financial investment that would produce long term returns." *Id.*[12]

Regarding Childers' state of mind, the district court found that he

> knew that his statements to Laura Jones regarding the risk of investing in Telron I were not true at the time he made them. He knew that [his lawyer] had refused to provide a tax opinion on the various investments. He knew that the investments had not been approved by the IRS, and he knew there was substantial risk involved.
>
> Childers denies telling the Jones[es] anything about the Israeli research and development investments. The Court finds more credible the testimony of the Jones[es] that Childers affirmatively misrepresented the substantial risks involved.

*Id.* at 8. In the summer of 1982, Childers learned that Telron I was undersubscribed but failed to inform the Joneses that they were entitled to a refund of their investment. Then, in September and October 1982, Childers was informed by a number of his clients that the IRS was questioning the legitimacy of the Israeli investments. The trial judge found that Childers, knowing full well that his clients' deductions had not been upheld and despite the fact that he had by then lost confidence in these investments, still advised the Joneses that their deductions *had* been upheld and that the financial responsibility for the audits had reverted to the general partner in Israel.

In late 1982, Childers persuaded the Joneses to invest in Telron II by repeating the misrepresentations and non-disclosures made for Telron I. Then, in August 1983, the Joneses received a letter from Childers' administrative assistant, Frank Schuette, recommending that they join a common tax defense fund to contest the disallowance of

---

12. The trial judge found that the Joneses "did not have a basic understanding of business matters, tax matters or investments. By any standard, they would be considered unsophisticated investors." *Order of June 26, 1992.*

deductions claimed by investors in other Israeli investments. Laura Jones again called Childers, who told her not to contribute to the fund because the Telron investments had set aside money for this purpose. The trial court concluded as follows:

> The Jones[es] were repeatedly told by Childers and TSI not to be concerned about the investments and they trusted his advice. Between September 1982 and June 1985, Childers and [his lawyer] repeatedly assured Plaintiffs that they would take care of the IRS and everything with respect to the audits would turn out fine. On the financial statements that TSI prepared for the Jones[es], the risks associated with the investments were not revealed. For example, the financial statement for 1983 did not reveal any contingent liabilities associated with the investments, as would be required by generally accepted accounting principles.

*Id.* at 11. In June 1985, the Joneses received their first notice of tax deficiency from the IRS regarding the 1981 Telron I investment. Some months later, they received a second notice of deficiency for their 1982 investment in Telron II.

Based upon these factual findings, the district court concluded that

> [t]he information received by the Jones[es] regarding the audits of other Israeli research and development investments and regarding the common defense fund alone did not provide notice of a right to a cause of action against Childers and TSI. In the face of this information, the Jones[es] exercised reasonable due diligence to determine whether injury had been sustained or that a right had been invaded. The Jones[es] contacted Childers, their fiduciary, who assured them that there was no reason for concern. The Jones[es] could not recognize their right to a cause of action, even after the exercise of reasonable due diligence, until they received notice from a party other than their fiduciary.

*Id.* at 14. The district court therefore rejected the Defendants' arguments that the Joneses' causes of action accrued when they first sustained their injury, i.e. when the Telron II purchase was finalized in early December 1982. Finding that this argument "fails to take into consideration the issue of notice or discovery," the Joneses' causes of action were found to have accrued when they received their first IRS notice of deficiency in June 1985. Separately, the district court ruled that even if the statutes of limitations would have begun to run as early as December 1982, they were equitably tolled by Childers' fraudulent concealment of the Joneses' right to a cause of action. *Nardone v. Reynolds,* 333 So.2d 25 (Fla.1976); *First Federal Savings & Loan v. Dade Federal Savings & Loan, supra.,* 403 So.2d at 1100–1101.

iii. *Analysis.*

■ Defendants contend that the district court committed error in failing to rule that the Joneses' causes of action accrued upon completion of the purchase of Telron II early in December 1982. Second, it is argued that the statutes of limitations were not equitably tolled because the Joneses' were put on notice of their causes by the risk disclosure language in the Telron prospectuses. See *Armbrister v. Roland International Corp.,* 667 F.Supp. 802 (M.D.Fla.1987).

With respect to the first argument, we disagree with the factual assertions underlying Defendants' position. As demonstrated by our lengthy recital of the trial judge's factual findings, she took great pains to explain exactly why she found that the Joneses, as victims of Childers' dissembling and false assurances as to the condition of their investments and tax liability, could not have discovered the invasion of their legal rights until a third party, the IRS, first gave notice of their tax deficiency. We find no clear error in these factual findings and will not presume to second guess the trial judge's assessment of the credibility of the witnesses and the weight assigned to their testimony. *Lincoln v. Bd. of Regents,* 697 F.2d at 939–940; *United States v. Fidelity Capital Corp.,* 920 F.2d at 836 n. 36; *Anderson v. Bessemer City,* 470 U.S. at 575, 105 S.Ct. at 1512. Accordingly, we hold that the trial judge properly applied Florida's discovery rule in concluding that the Joneses, after making reasonable at-

tempts to learn from Childers the condition of their investments and the potential tax consequences, were not put on notice of their right to a cause of action until June 1985. As this action was filed some two and a half years later, in December 1987, the Joneses' claims for breach of contract, breach of fiduciary duty, negligence, fraud, and violations of CRCPA were not time-barred by the applicable statutes of limitations.

■ Though it is unnecessary to reach the issue of equitable tolling, we briefly note that Defendant's reliance on the *Armbrister* decision is misplaced. "Generally, two elements are required before the equitable principle of fraudulent concealment will be utilized to toll the statute of limitations, to-wit: plaintiff must show both successful concealment of the cause of action and fraudulent means to achieve that concealment." *Nardone v. Reynolds, supra,* 333 So.2d at 37. The *Armbrister* court, applying this test, held that the doctrine of equitable tolling was not available to delay the running of the statute of limitations for plaintiffs participating in *arms-length transactions* who had, by their own inaction and through no one else's fault, failed to read public offering statements which would have put them on notice of the problems existing as to property they were buying. *Armbrister, supra,* 667 F.Supp. at 810–811.

Seizing upon this reasoning, Defendants argue that the Joneses' failure to heed the disclosure language in the Telron prospectuses places the blame squarely with them, rather than with the Defendants, who argue that there was no fraudulent concealment because they did not affirmatively prevent Plaintiffs from gaining access to the prospectuses. We find, however, that *Armbrister* distinguished the higher due diligence burden imposed on participants in arms-length transactions from what can reasonably be expected of those dependent on the advice and counsel of a fiduciary: "... where the circumstances give rise to a fiduciary relationship between the parties, the defendant's denial of wrongdoing or failure to disclose may be sufficient to satisfy the second element necessary for equitable tolling." 667 F.Supp. at 810. This language is on all fours with the facts of this case. On each occasion that Laura Jones contacted Childers with questions and concerns about the security of their investments and the potential ramifications of the IRS audit, Childers' misrepresentations served to conceal from the Joneses the invasion of their legal rights. *Nardone v. Reynolds,* 333 So.2d at 37; *First Federal Savings & Loan v. Dade Federal Savings & Loan,* 403 So.2d at 1100–1101. In the alternative, and allowing some credence to Defendants' notice argument, the district court was correct in concluding that the Joneses' causes of action were, in any event, equitably tolled until June 1985.

c. *Whether the district court abused its discretion by refusing to allow defendants to add affirmative defenses.*

■ On March 18, 1992, less than one week prior to the pretrial conference, Defendants moved to amend their answer to add, *inter alia,* the affirmative defenses of estoppel, waiver, ratification, and failure to mitigate damages. At the March 24, 1992, pretrial conference, the trial judge denied the motion as untimely, stating that "[i]t's too late at this stage of the proceedings to be amending affirmative defenses." Defendants contend that this ruling constituted an abuse of discretion.

We disagree. Though Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend pleadings "shall be freely given when justice so requires," the Supreme Court specifically listed "undue delay" among the factors which a district court, in its exercise of discretion, may consider as justifying the denial of leave to amend. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The trial judge was within her discretion to deny as untimely the Defendants' attempt to add—nearly four years after the filing of the original answer, after the completion of discovery, and after the trial was set—a host of new affirmative defenses which would have further complicated an already complex case and likely delayed the trial by necessitating the reopening of discovery.

d. *Whether the district court erred in awarding treble damages pursuant to Florida's Civil RICO statute.*

Having found that the district court properly ruled that Childers violated certain provisions of Florida's securities laws, Fla.Stat. § 517, and that such violations may constitute predicate criminal acts for an award of treble damages under Fla.Stat. § 772, the state's civil RICO statute [13], we turn directly to the issue of whether the trial judge properly awarded Gordon Jones treble damages. Defendants argue that treble damages should not have been awarded because there was insufficient evidence that Childers and TSI engaged in a "pattern of criminal activity" which proximately caused the damages the Joneses suffered.

Florida Statutes § 772.104 provides for an award of treble damages in a civil action when the following requirements are met:

Any person who proves by clear and convincing evidence that he has been injured by reason of any violation of the provisions of s. 772.103 shall have a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts. In no event shall punitive damages be awarded under this section....

Under § 772.103(3), it is "unlawful for any person: ... Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through *a pattern of criminal activity* or the collection of an unlawful debt." Fla.Stat. § 772.103(3) (emphasis added). Florida Statutes § 772.102(4), in turn, defines "pattern of criminal activity" as:

engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing charac-

teristics and are not isolated incidents; provided that the last of such incidents occurred within 5 years after a prior incident of criminal activity. For purposes of this chapter, the term "pattern of criminal activity" shall not include two or more incidents of fraudulent conduct arising out of a single contract or transaction against one or more related persons.

Our interpretation of this provision is informed by case law interpreting the federal RICO statute, 18 U.S.C. §§ 1961–1968, on which Chapter 772 is patterned. *See Finkelstein v. Southeast Bank, N.A.,* 490 So.2d 976, 979 (Fla. 4th DCA 1986); accord *Moorehead v. State,* 383 So.2d 629 (Fla.1980) ("The Florida legislature incorporated the federal case law by explicitly defining 'pattern of criminal activity' to include interrelated incidents that are not isolated.").

i. *Federal RICO jurisprudence*

In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court held that a plaintiff seeking treble damages under § 1962(c) of the federal RICO statute must satisfy four elements of proof: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." 473 U.S. at 496, 105 S.Ct. at 3285. The Court equated "racketeering activity" with the commission of a predicate act, § 1961(1), and therefore struck down a court-imposed fifth element requiring a plaintiff to prove an "amorphous 'racketeering injury'" separate from, and in addition to, the harm caused by the predicate acts. 473 U.S. at 495, 105 S.Ct. at 3284. The broad aim of this holding was to proscribe ad hoc redrafting of RICO by courts which disapprove of its increased use against "legitimate" businesses engaged in garden variety frauds, and the scarcity of actions "against the archetypal, intimidating mobster" on whom Congress focused when drafting the statute. 473 U.S. at 499, 105 S.Ct. at 3286.[14]

---

13. *See supra* note 3.

14. Though concerned with the potential long-term effects of this phenomenon, *Sedima* rejected the view of some Courts of Appeal that this trend represents a misappropriation of the statute by private plaintiffs, prosecutors, and courts: "The

'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern.'" 473 U.S. at 500, 105 S.Ct. at 3287.

*Sedima* cautions, however, that its test for a "pattern of criminal activity" should not be mechanistically applied whenever two similar predicate acts are committed:

> ... while two acts are necessary, they may not be sufficient. Indeed, in common parlance, two of anything do not generally form a 'pattern.' The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: 'The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern.' S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan).

*Sedima*, 473 U.S. at 496–497, n. 14, 105 S.Ct. at 3285, n. 14. The Court also noted that in 18 U.S.C. § 3575(e)—which appears to be the model for Fla.Stat. § 772.102(4)—Congress further refined the definition of "pattern of criminal activity": " '[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " 473 U.S. at 497, n. 14, 105 S.Ct. at 3285, n. 14, quoting 18 U.S.C. § 3575(e).

Four years after *Sedima*, the Supreme Court returned to the question of what constitutes a "pattern of criminal activity" for RICO purposes. In *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), Justice Brennan, writing for the Court, elaborates upon *Sedima's* concept of "continuity plus relationship" as central to the pattern element: "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." 492 U.S. at 239, 109 S.Ct. at 2900. Rejecting as overly rigid the Eighth Circuit's use of a "multiple scheme" test whereby private plaintiffs or prosecutors are required to prove "continuity" by showing that defendants engaged in multiple similar fraudulent schemes in the past or present, *H.J. Inc.* instead defines "continuity" flexibly as "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." 492 U.S. at 241, 109 S.Ct. at 2901. Justice Brennan acknowledges the fact-specific nature of "continuity" inquiries and wisely does not attempt to enumerate the "field of possibilities" which courts may face, instead offering guidance through further insight into RICO's legislative history:

> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. S.Rep. No. 91–617, at 158. (original emphasis).

492 U.S. at 242, 109 S.Ct. at 2902. A showing that the predicate acts are "part of an ongoing entity's regular way of doing business" would, for example, satisfy the "continuity" requirement either in the case where the entity is a traditional criminal enterprise or with respect to an ongoing legitimate business. While lamenting that "RICO may be a poorly drafted statute," Justice Brennan declines to use the explication of "continuity" as a pretext for creating an organized crime stricture that appears nowhere in the language of the statute. 492 U.S. at 249, 109 S.Ct. at 2905.

ii. *Analysis*

Florida courts grappling with the state's civil RICO provisions acknowledge the development of RICO pattern element jurisprudence in *Sedima* and *H.J. Inc.* See, e.g., *Boyd v. State,* 578 So.2d 718, 720–721 (Fla. 3d DCA 1991). We apply the Supreme Court's teaching in considering whether the district court properly found that Childers and TSI engaged in a pattern of criminal activity.[15] The trial judge offered two separate bases for her ruling. First, the sales of Telron I and II to the Joneses in 1981 and 1982 were found to constitute a pattern of criminal activity within Fla.Stat. § 772.-102(4). Second, it was found that the sale by Childers between 1979 and 1984 of eight Israeli research and development investments to five Florida clients, including the Joneses, as well as the rendering of investment advice to other Florida residents, independently constituted a pattern of criminal activity.

 We cannot agree that the sales of Telron I and II *in and of themselves* constituted a pattern of criminal activity. The district court found that a pattern existed between the sales of Telron I and II because they were related and demonstrated continuity. Specifically, the continuity element was deemed satisfied because these two essentially identical sales to the Plaintiffs established that Childers "regularly conducted" his business in this manner. We find that the evidence with respect only to Telron I and II fails to support this finding. This Circuit has explicitly held that under *Sedima*, "a 'pattern of racketeering activity' requires proof of

something beyond the two predicate acts themselves." *U.S. v. Gonzalez,* 921 F.2d 1530, 1545 (11th Cir.1991). That something is the threat of continuing racketeering activity. *Id.* Though "continuity" may be established by showing that the predicate acts are part of the way a defendant regularly conducts his business, this showing ordinarily must encompass a sustained period or set of examples sufficient to draw this conclusion with reasonable certainty. *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902. Such a showing is not made solely on the basis of the sale of Telron I and II to the Joneses; standing alone, these sales are more susceptible to characterization as sporadic or isolated acts than as a pattern of criminal activity.

This case does, however, provide the opportunity to view the Joneses' Telron investments in the context of Israeli investments by other TSI clients in Florida.[16] The issue is whether the evidence of these other acts, when added to that adduced in relation in the Joneses' investments, achieves the alchemy needed to transform this action from a routine fraud case to a fully proven RICO action. At the trial, the Plaintiffs offered testimony from several professional athletes who were former Childers clients during the years relevant to this action, and who had invested in Israeli tax shelter investments, including the Telron securities. These ex-clients testified that Childers induced their trust in his investment prowess, urged them to invest in Telron and other Israeli investments without disclosing their high risk factor, and then misled them about the tax consequences when the schemes unravelled.

---

**15.** We note that a plaintiff seeking RICO damages must, in addition to proving that the defendant engaged in a pattern of criminal activity, also demonstrate that his damages were proximately caused by such activity. See *Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (holding that the phrase "by reason of" in federal RICO statute [employing similar language to Fla.Stat. § 772.104] requires that a plaintiff show that the acts in question proximately caused his damages); and *Pelletier v. Zweifel,* 921 F.2d 1465, 1499 (11th Cir.1991), *cert. den.,* —— U.S. ——, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991).

**16.** With respect to this second "pattern," the district court wrote:

> The relationship among these predicate acts can be seen in that they were committed somewhat closely in time to one another, involved similar victims and involved similar or the same type of misconduct. Continuity is evident in that the predicate acts involved different victims at different points in time, all as one aspect of Childers' regular way of doing business. The predicate acts involving all sales made and advice rendered by Childers in connection with the sale of Israeli research and development investments within the State of Florida constitute a pattern of criminal activity, as defined by Florida Statutes § 772.102(4).
>
> *Order of June 26, 1992,* at 31–32.

All claimed that they lost many thousands of dollars as a result of entering into these transactions.

The district court viewed this evidence as determinative of continuity and a RICO pattern. We agree. While, as discussed above, the two violations perpetrated against the Joneses do not, in and of themselves, provide a sufficient basis for finding "continuity", the totality of the evidence as to Childers' business practices with respect to the other athlete investors sufficiently establishes a pattern of criminal activity.

■ We also find that there was no error, as Defendants imply, in the admission of such testimony for the limited purpose of attempting to prove continuity. In criminal cases, this and other circuits have permitted prosecutors seeking to prove RICO violations to introduce testimony relating to uncharged criminal acts against a defendant. *See, e.g., Gonzalez, supra.,* 921 F.2d at 1546 (holding that evidence that defendant "piloted [drug] flights other than these charged as predicates, as well as his repeated presence [at the sites of the drug operations], ... are clearly relevant and admissible to proving RICO's other elements"); *United States v. Kaplan,* 886 F.2d 536, 542–544 (2nd Cir.1989) (permitting reliance on external evidence regarding acts uncharged in the RICO conspiracy for purposes of establishing continuity sufficient to support a finding of a pattern of criminal activity). In *United States v. Finestone,* 816 F.2d 583, 587 (11th Cir.1987), *cert. den.,* 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987), this court also permitted the prosecution to offer evidence of a drug murder for which the defendant was not charged as proof of his participation in a RICO conspiracy through a pattern of racketeering activity and overt acts.

Although there are some important restrictions on a prosecutor's use of evidence regarding other acts in the criminal RICO context, e.g., a defendant must have some notice of the evidence to be presented in order to be given a fair chance to defend against the evidence, the court has found no precedent for applying such restrictions to a civil RICO case. Standard evidentiary rules govern this situation. At the trial of this matter, the testimony of the other professional athletes involved investment transactions between themselves and the defendants (Childers and TSI). Although these investors and their investment transactions are not directly related to the case at hand, the Joneses properly offered this testimony as relevant to establishing the continuity prong of the alleged RICO violation. The Joneses have shown that the fraud perpetrated on them by Childers and TSI was strikingly similar to that perpetrated on other investors, particularly the professional athletes who testified at the trial. All of these former clients of Childers had invested in Israeli tax shelter investments, including the Telron securities, on the urging of Childers and based on his assurances about their investment potential. All of these former clients also lost a significant amount of money as a result of these investments. The testimony regarding the investment failures of the other athletes who were Childers' clients was sufficiently similar to the Joneses' allegations regarding their investment failures with Childers that it should be admissible pursuant to Rules 401 and 402 of the Federal Rules of Evidence. The evidence is also admissible under Rule 404(b) because it demonstrates "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident". Fed.R.Evid. 404(b). These considerations were important in the court's ultimate determination of the admissibility of such evidence and consequently the sufficiency of the proof of predicate acts required to support the RICO charge in the Joneses' complaint.

■ The Supreme Court has held that the demonstration of a "pattern" of racketeering activity encompasses proof of "continuity plus relationship." *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242–43, 109 S.Ct. at 2902. The testimony offered by the Joneses and the other investors relates to acts that took place "somewhat closely in time to one another" from 1979 to 1984, and within the five year range imposed by Fla.

Stat. § 772.102(4). As discussed above, the acts were highly similar in nature and support a finding that this practice was Childers' regular way of doing business. The testimony of the other investors independently substantiates the district court's finding that the other sales constituted *predicate acts* on the same level as the sale of Telron I and II to the Joneses.[17] "[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. at 2902. It is irrelevant that such claims were not joined with this action.

The Third Circuit, in *Banks v. Wolk*, 918 F.2d 418 (3d Cir.1990), has noted that the fact that a RICO plaintiff was not a victim of the additional frauds alleged as predicate acts should not carry much weight.

> The reference to "similar victims" in *H.J., Inc.* cannot be read to require that a plaintiff be injured by more than one predicate act.... The alleged victims in this case were "similar" in the sense that they all were engaged in business dealings with the Cohens [ (two of the defendants) ] through [the Cohens' companies]. Likewise, the reference to "similar participants" does not require that Wolk [ (another defendant) ] have participated in the Cohens' other schemes. Once the requisite connection with the RICO enterprise is shown, the fact that a defendant employed different associates for different predicate acts should not be of overriding significance.

*Id.* at 424–25. The predicate acts at issue in the case before us are far more similar than those at issue in *Banks*. Indeed, Childers did not even employ different associates for the different predicate acts. Childers' predicate acts are virtually identical in every respect except the victims, and the victims are all "similar" in that they are all professional athletes. Accordingly, Childers' violations satisfy the continuity requirement.

The Sixth Circuit has narrowly construed the relationship prong of the proof necessary to establish a "pattern of racketeering activity" in RICO cases. In *Vild v. Visconsi*, 956 F.2d 560 (6th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992), the court found that a plaintiff who alleged that defendants fraudulently induced him to enter a marketing agreement to sell real estate interests could not then claim that the same defendants' wire and mail fraud in soliciting customers to purchase the real estate interests constituted predicate acts for the purposes of proving a RICO violation. Even under the Sixth Circuit's admittedly narrow construction[18], the predicate acts in the case before us clearly meet the relationship requirement. All of the predicate acts upon which the Joneses rely involve the sale by Childers of unregistered Israeli securities to professional athletes, like the sale to Gordon Jones. Thus, these acts involve "similar types of conduct and victims who are essentially in the same position." *Id.* That the Joneses were directly harmed by only two of the many predicate acts upon which they rely is not determinative; all of the predicate acts were sufficiently connected to meet the relationship requirement, even as that requirement is articulated in *Vild*.

The number of occasions on which Childers and TSI fraudulently induced the professional athletes to invest in the Israeli securities, the relationship between the fraud with respect to the Joneses and the fraud perpetrated against the other investors, the similarity of the victims—all professional athletes—and the similarity of the acts, taken collectively, demonstrate a pattern of racketeering activity which constitutes proof of a RICO violation. We therefore affirm the conclusions of the district court judge on that basis. Viewed in its totality, the evidence establishes that Childers and TSI engaged in a pattern of criminal activity within the meaning of Fla.Stat. § 772.102(4).

## IV. DAMAGES

Because of the differing claims presented by Gordon and Laura Jones, the damage

---

17. *See supra* note 16.

18. The Sixth Circuit specifically stated that it construed the relationship prong "more narrowly than the Third Circuit did in *Banks*." *Vild v.*

*Visconsi*, 956 F.2d 560, 568 (6th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992).

issues were complicated. The district court's thoughtful approach to these damage problems was largely accurate. For the reasons hereafter stated, however, it will be necessary to remand to the district court for reconsideration the award of damages. For example, the total award to Laura Jones of $123,337, incorporates $73,337 for which the defendants are liable jointly and severally to Laura and Gordon Jones, but not to each separately. The individual losses incurred by the Joneses, together, after the period in 1981 when they began to commingle their funds, do not constitute separate bases for calculation of actual damages due to each person. Rather, the following damage items should be awarded to both Joneses jointly and severally, not twice counted to inflate the damages due them "individually": $12,606, the present value of the Joneses' 1982 tax deficiency minus taxes paid for real income; $30,484, the present value of their 1981 investment of $12,000 in Telron I; $23,073, the present value of their 1982 investment of $10,000 in Telron II; $5,577, the present value of the $2,417 in interest paid to the bank which lent the Joneses the capital for the Telron investments; and $1,597, the present value of the $762 in interest paid to the bank which lent the Joneses the capital for the Telron investments. The sum of these figures is $73,337, and that is the amount of damages to which the Joneses are jointly and severally entitled. In short, while Gordon and Laura Jones have a joint and several interest in the $73,337, that amount cannot be the basis for separate judgments for each.

In addition, Gordon Jones is entitled to damages in the amount of $50,752 for his 1981 tax deficiency, minus taxes paid for real income. Gordon Jones is also entitled to damages in the amount of $19,980, representing the management fees paid [19] to TSI under the Business Management Agreement. We have arrived at the sum of $19,980 for management fees as a result of discerning what appears to be a mathematical error in the district court's computation of that amount, from the figures noted in the district court's opinion. While the district court was correct to include this amount in its damage calculation, it erred in doing so pursuant to the Joneses' claim for rescission of the Business Management Agreement. A plaintiff suing upon a contract may elect either to seek damages or rescission of the contract, but he may not do both. *Barbe v. Villeneuve*, 505 So.2d 1331, 1332 (Fla.1987) ("The election of remedies doctrine is an application of the doctrine of estoppel and operates on the theory that a party electing one course of action should not later be allowed to avail himself of an incompatible course.... The purpose of the doctrine is to prevent a double recovery for the same wrong."); *accord Wynfield Inns v. Edward LeRoux Group, Inc.*, 896 F.2d 483 (11th Cir.1990). These observations are made for the aid of the district court as this matter must be remanded for the computation of damages, which shall include the management fees as damages sustained by Gordon Jones. This court has, as noted heretofore, determined that management fees, paid under the circumstances in question and which relate only to the investment services provided, should be awarded as damages to make the plaintiff whole, rather than by way of rescission—which, if done completely, would not accomplish that objective. Thus, Gordon Jones' damages are $144,069 (the sum of $73,337 plus $50,752 plus $19,980). The addition of the $19,980 as conventional damages, rather than as the product of a partial rescission, presents the question (not considered by the district court due to the rescission conclusion) of whether or not to include that amount in Gordon Jones' total damage computation before trebling. We suggest that it would be appropriate to do so. The district court determined that Defendants violated the Florida Civil Remedies for Criminal Practices Act, Florida Statutes, Chapter 772, which, as indicated, calls for the trebling of plaintiff's (Gordon's) damages. The revision would bring the treble damage award to $432,207. With the $50,000 award for mental anguish, Gordon Jones' total award, it is suggested, would be $482,207 (of which $73,337 is joint and several with Laura Jones).

---

19. Childers received five percent of Gordon Jones' income from professional football, as payment for Childers' financial planning and investment advice rendered to the Joneses.

For her damages, Laura Jones has a joint interest in the $73,337 damages award and is individually entitled to judgment for the mental anguish award ($50,000). The district court is directed to recalculate the actual damages suffered by the Joneses to the end that they receive damages which do not reflect a double payment.

For the reasons stated, this action is REVERSED and REMANDED for a recalculation of damages taking into account the erroneously calculated damages due to Laura Jones, but including as additional contractual damages the amount originally termed rescission damages. In all other respects, including the award of $50,000 to both Gordon and Laura Jones for mental anguish, the damages award is AFFIRMED.

## V. CONCLUSION

In conclusion, this case is AFFIRMED in part and REVERSED in part. We REMAND with instructions to the district court to recalculate the damages due the Joneses, consistent with the above-stated findings of this Court.